# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>The property located at 2225 S. Maple St, Santa<br>Ana, California 92707 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 8:22-MJ-00047

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §2252A(a)(2) | Distribution of Child Pornography |
| 18 U.S.C. §2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Kevin Leduc
_____
*Applicant's signature*

Kevin Leduc, Special Agent (DHS)
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Santa Ana, CA_____

Autumn D. Spaeth, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Melissa Rabbani (714) 338-3499

**AFFIDAVIT**

I, Kevin Leduc, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), assigned to HSI Orange County, California.  In 2014 I was hired as a Computer Forensic Analyst.  In 2017, I attended the Criminal Investigators Training Program located at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have participated in and/or received training in numerous investigations of criminal activity, including, but not limited to, the investigation of narcotics offenses, money laundering, fraud, child pornography, alien smuggling and human trafficking. During investigation of these matters, I have participated in the execution of search warrants.

2.   I investigate, among other things, the sexual exploitation of children and child pornography in the Central District of California as part of the Orange County Child Exploitation Task Force ("OCCETF").  The OCCETF is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 2252, et seq.  As part of these investigations, I have observed and reviewed numerous examples of child pornography (as

defined in 18 U.S.C. § 2256) in all forms of media, including computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

## II.  PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of an application for a warrant to search the premises located at 2225 S. Maple St, Santa Ana, California 92707 (the "SUBJECT PREMISES"), more fully described below and in Attachment A, which is attached hereto and incorporated herein by reference, and to seize evidence, fruits, and instrumentalities of criminal conduct, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18 U.S.C. §§ 2252A(a)(2) (distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (collectively, the "Subject Offenses").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

2

conversations and statements described in this affidavit are related in substance and in part only.

### III.  **PREMISES TO BE SEARCHED**

5.    The SUBJECT PREMISES, as described in this paragraph and in Attachment A, is the property located at 2225 S. Maple St, Santa Ana, California 92707.  The SUBJECT PREMISES is a single-story home with a detached garage, with two white single garage doors both facing south.  The SUBJECT PREMISES has a cream stucco exterior and a blue shingle roof.  The front door of the SUBJECT PREMISES is brown with a black security door facing South.  The numbers "2225" are affixed in black numbers on white tile above the entry way to the front door of the house facing the street.

### IV.   **SUMMARY OF PROBABLE CAUSE**

6.    Along with other members of law enforcement, I have been investigating individuals who are trading child pornography on the Internet through peer-to-peer file-sharing programs.  As set forth in greater detail below, law enforcement has identified a computer making child pornography files available for sharing on the Gnutella network, which is described in detail below, between October 19, 2021, and October 20, 2021. On each occasion, the computer was connected to the Internet using Internet Protocol ("IP") address 172.116.240.63 ("SUSPECT

IP ADDRESS").  Law enforcement downloaded approximately fourteen files of suspected child sexual abuse material (CSAM) from this computer, while it was using the SUSPECT IP ADDRESS.  The files were subsequently reviewed and determined to contain CSAM.  The SUSPECT IP ADDRESS resolves to an Internet subscriber at the SUBJECT PREMISES.

7.   On October 28, 2021, Charter Communications returned a DHS Summons confirming that the SUSPECT IP ADDRESS was registered to Guadalupe Hernandez-Lomeli at the SUBJECT PREMISES.  Thus, and as set forth more fully below, there is probable cause to believe that the SUBJECT PREMISES contains evidence of the Subject Offenses.

### V.   <u>DEFINITION OF TERMS</u>

8.   The following terms have the indicated meaning in this affidavit:

a.   The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.

b.   The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

c.   The term "Internet" is defined as the worldwide network of computers — a noncommercial, self-governing network devoted mostly to communication and research with roughly 4.6 billion users worldwide.  The Internet is not an online service

and has no real central hub.  It is a collection of tens of
thousands of computer networks, online services, and single user
components.  In order to access the Internet, an individual
computer user must use an access provider, such as a university,
employer, or commercial Internet Service Provider ("ISP"), which
operates a host computer with direct access to the Internet.

d.    The term "Internet Protocol" ("IP") is defined as
the primary protocol upon which the Internet is based.  IP
allows a packet of information to travel through multiple
networks (groups of linked computers) on the way to its ultimate
destination.

e.    The term "IP Address" is defined as a unique
number assigned to each computer directly connected to the
Internet (for example, 74.100.66.74).  Each computer connected
to the Internet is assigned a unique IP address while it is
connected.  The IP address for a user may be relatively static,
meaning it is assigned to the same subscriber for long periods
of time, or dynamic, meaning that the IP address is only
assigned for the duration of that online session.

f.    The term "Internet Service Provider" ("ISP") is
defined as a business that allows a user to dial into or link
through its computers, thereby allowing the user to connect to
the Internet for a fee.  ISPs generally provide only an Internet
connection, an electronic mail address, and maybe Internet
browsing software.  A user can also connect to the Internet
through a commercial online service such as AT&T, Verizon, or

Time Warner Cable.  With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases.

g.   The term "peer-to-peer" (sometimes referred to as "P2P") has come to describe applications or programs that allow users to exchange files with each other directly or through a mediating server via the Internet.[1]  A decentralized peer-to-peer file transfer network does not follow a model using different clients or servers; rather, it is a network of equal peer computers that simultaneously function as both "clients" and "servers" to the other users on the same network.

h.   The term "open source" is defined as software that includes a free license; in other words, it is freely available to everyone using the Internet.

i.   The term "share folder," in the context of peer-to-peer software, is a folder or directory on a computer's hard drive, which a peer-to-peer user can set up to share his/her contents with other computers on a peer-to-peer network.

j.   The term "browsing" is used in reference to P2P networks and refers to the ability of a peer-to-peer user to look at or browse the shared files of another peer-to-peer user.

k.   The terms "jpeg," "jpg," "gif," "bmp," and "art" are defined as graphic image files, namely, pictures.

---

[1] A computer that is performing tasks for other computers that are connected to it is often called a "server."  A "client" computer is one that is connected to a server and is making requests of the server.

6

l.    The terms "mpeg," "mpg," "mov," "avi," "rm," and "wmv" are defined as video or movie files.  To use these video files, one needs a personal computer or other digital device with sufficient processor speed, internal memory, and hard disk space to handle and play typically large video files.  One also needs a video file viewer or client software that plays video files.  One can download shareware or commercial video players from numerous sites on the Internet.

## VI.    BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND P2P FILE-SHARING TECHNOLOGY

9.    Based upon my training, experience, and knowledge gained from speaking with other knowledgeable officers, agents, and investigators in the investigation of child pornography and with P2P file-sharing programs, and information related to me by other law enforcement officers involved in the investigation of child pornography generally, I know the following information about the use of computers with child pornography:

10.    Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

11.   Peer-to-peer networks are frequently used in the
trading of child pornography.  I know that one such network is
known as the Gnutella network.  The Gnutella network is being
used to trade digital files, including still images and movie
files, of child pornography.  Based on my training and
experience, I know the following about the operation of the
Gnutella file-sharing network:

a.   Gnutella is an open-source publicly available
peer-to-peer file-sharing network.  Most computers that are part
of this network are referred to as peers or hosts.  A peer
computer can simultaneously share files, while downloading files
from other peers.  Peers may be elevated to temporary indexing
servers referred to as an "ultra-peer."

b.   Ultra-peers increase the efficiency of the
Gnutella network by maintaining an index of the file contents of
network peers.  Gnutella users ask ultra-peers for file sources
and are directed to one or more peers sharing the file or
portions of the file.  There are many ultra-peers on the
network.

c.   The Gnutella network can be accessed by computers
running different peer-to-peer software programs written to be
used on the Gnutella network.  These software programs are known
as client programs.  Some of the free publicly available
software clients are Limewire, BearShare, Phex, and Shareaza.
Shareaza is the software program being used in this case.  These
software programs share common protocols for network access and

8

file sharing.  The user interface, features and configuration may vary between the different software clients but all of them allow you to access the Gnutella network as either a client (the computer seeking a file), a candidate (the computer supplying the file), or an ultra-peer (the computer referring the client to the candidate).

      d.   During the default installation of a Gnutella software program, settings are established that configure the host computer to share files.  Based on my training, experience, and knowledge gained from speaking with other knowledgeable agents, officers, and investigators, the level of file sharing and/or number of files to be shared with a single peer can be manipulated in the settings of the Gnutella client software program.  A feature known as browsing may also be turned on. Depending upon the Gnutella client program used, a user may have the ability to reconfigure some of these settings during installation or after the installation has been completed. Typically, the peer-to-peer software can be configured to establish the location of one or more directories or folders whose contents (files) are made available for distribution or sharing to other Gnutella peers.  Typically, the peer-to-peer software can be configured to establish whether other users of the network can obtain a list or browse the files being shared by the host computer.  I know that if an investigator is able to browse a shared directory on a candidate's computer, a direct connection between the computer being used by the investigator

and the candidate's computer is established at that specific time, on that specific date.  I also know that the browsed files are physically present at that time, on that date, on the candidate's computer.

12.  The Internet Crimes Against Children ("ICAC") Task Force operates under the direction of the Office of Juvenile Justice and Delinquency Prevention, and in conjunction with ICE(formerly the United States Customs Service), Federal Bureau of Investigation ("FBI"), and the National Center for Missing and Exploited Children ("NCMEC").  The ICAC maintains a list of verified positive child pornography "SHA1 values," explained below.

13.  SHA1 or "Secure Hash Algorithm Version 1," is a mathematical encryption method used to produce a unique digital signature of a file.  No two files naturally produce the same SHA1 value unless the contents are identical; thus, the content of some computer files can be positively established without ever viewing the content, once a known file with a certain SHA1 value has been identified.  SHA1 values were specifically developed by government agencies, including the National Security Agency, to assist in the unique identification of computer files.  The United States of America has adopted the SHA1 hash algorithm described herein as a Federal Information Processing Standard.  A file processed by this SHA1 operation results in the calculation of a unique hash value for that file, often referred to as a digital signature.  SHA1 signatures

provide a certainty exceeding 99.99 percent that two or more files with the same SHA1 signature are identical copies of the same files, regardless of their file names.

14.  The Gnutella network uses SHA1 values to improve network efficiency.  Users may receive a selected file from numerous sources by accepting segments of the file from multiple peers.  The Gnutella software being used then reassembles the complete file on the local computer.  The Gnutella program succeeds in reassembling the file from different sources only if all the segments came from the exact copy of the same file.  The network uses SHA1 values to ensure exact copies of the same file are used during this process.

15.  Upon connecting to the Gnutella network, the Gnutella software being used compiles a list of the shared files, file details and the file's associated SHA1 values.  This list is then submitted to the ultra-peers.  This information is then propagated to other ultra-peers throughout the network and made available to anyone running a unique search.

16.  The frequency of updating information as file changes occur or candidates leave the network depends upon the client software being used and Gnutella networking protocols.  The information sent to the ultra-peers is data about the file and not the actual file.  The file remains on the peer computer.  In this capacity, the ultra-peer acts as a pointer to the files located on each peer.

11

17.   The Gnutella software allows the user to search for pictures, movies, and other files by entering descriptive text as search terms.  These terms are typically processed by the ultra-peers based upon the information about the files submitted by the Gnutella user.  Entering search terms into a Gnutella client program returns a list of files and descriptive information pertaining to each file, including the associated SHA1 signature.

18.   I know that an investigator is able to compare the SHA1 signatures of files being shared on the network to previously identified child pornography SHA1 signatures.

19.   Using a publicly available Gnutella client, an investigator can select the SHA1 signature of a known file as they attempt to locate and download the known file from the Gnutella network.

20.   Once a specific file is identified, the download process can be initiated.  Once initiated, an investigator is presented with a list of peer or user IP addresses that have been recently (generally within the last 24 hours) identified as candidates for download.  This allows for the detection and investigation of computers involved in possessing, receiving and/or distributing files of previously identified child pornography.

21.   I know that IP addresses can be used to identify the location of a computer.  A computer can be traced to a specific region or area.  The ability to identify the location of these

IP addresses is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection.

22.  A review of the SHA1 signatures allows an investigator to identify the files that are on a peer computer.

23.  At this point in the investigative process, a recent (generally within the last 24 hours) association between a known file (based upon SHA1 comparison) and a computer having a specific IP address located within a specific region can be established.

24.  Once this association has been established, an investigator can attempt to download a file previously identified as "child notable" from the associated peer.  "Child notable" means an image or video that another user of the Child Protection System[2] ("CPS") has viewed and documented as child pornography, with a description in their media library, as part of a criminal investigation.

_____

[2] The Child Protection System is a law enforcement tool accessed via the Grid Cop website.  Access and a license to CPS is granted to law enforcement personnel after completion of a three-day training course about the use of CPS and ShareazaLE. ShareazaLE is a peer-to-peer client software program developed by the Child Rescue Coalition.  It can access, communicate with, and download from multiple peer-to-peer networks, such as Gnutella, eDonkey, and Ares.  ShareazaLE is developed so that it downloads files from a single source rather than multiple sources.  Law enforcement users of ShareazaLE are granted access and a license for ShareazaLE after completion of a three day training course. CPS communicates suspect information to the users of ShareazaLE for download.

25.  If the function known as browsing is turned on, the
investigator can view or browse the contents of the target
peer's shared folder.  This is dependent upon several factors,
including the Gnutella configuration and available resources.
Browsing may or may not be possible.  If browsing is available,
a listing of the files being shared by the associated target
peer may be viewable.  In order to obtain this list of files, a
direct connection between the computers must occur.  This
browsing connection is a default setting.  Browsing is open to
anyone using the publicly available Gnutella software.  The file
list can only be obtained if the associated target peer is
connected to the Gnutella network and the Gnutella software
being used is configured for browsing.

26.  By receiving either a browsed file list or portions of
a download file from a specific IP address, the investigator can
conclude that a computer, in this jurisdiction, is running a
Gnutella client and is possessing, receiving and/or distributing
specific and known visual depictions of child pornography.

27.  This investigation of peer-to-peer file sharing
networks is a cooperative effort of law enforcement agencies
around the country.  Many of these agencies are associated with
the ICAC Task Force Programs.  Many of the officers involved in
this effort are using the technology and methods described
herein to investigate peer-to-peer networks.  This methodology
has led to the issuance and execution of search warrants around

the country resulting in many seizures of child pornography and
arrests for possession and distribution.

### VII.   <u>INVESTIGATION OF GNUTELLA NETWORK AND SHAREAZA CLIENT</u><br><u>SOFTWARE USING IP ADDRESSES AND GUIDS</u>

28.   The term Globally Unique Identifier ("GUID") is
defined as a number that is produced by the Windows Operating
System ("Windows OS") or by some Windows applications to
identify a particular component, application, file, database
entry, and/or user when the particular component, application,
file, database entry, and/or user is created on a device.  GUIDs
can be created in a number of ways, but usually they are a
combination of a few unique settings based on a specific point
in time.  Based on my training, experience, and knowledge gained
from speaking with other knowledgeable officers, agents, and
investigators, the GUID of a Gnutella client software program
will remain the same even if the user of the Gnutella client
software program utilizes a different IP address.  This allows
law enforcement to track IP addresses across the Internet when a
user of a particular Gnutella client software program receives
different IP addresses from the ISP, or when different IP
addresses are used by one user through accessing a VPN.

29.   In the case of Gnutella Network peer-to-peer file
sharing technology, a new GUID will be created on a particular
computer if the user uninstalls the Gnutella client software
program on the device and then reinstalls the Gnutella client
software program on the device.  Based on my training,

experience, and knowledge gained from speaking with other knowledgeable agents, officers, and investigators, generally an upgrade to a newer version of a Gnutella client software program will not change the GUID, but the installation of a newer version of a Gnutella client software program will change the GUID.  Additionally, based on my training, experience, and knowledge gained from speaking with other knowledgeable agents, officers, and investigators, an individual can generate a new GUID when using Shareaza as their Gnutella network client software program, which the suspect of this investigation is using.

30.  In this case, the target of the investigation is using Shareaza as the software program to access Gnutella.  GUIDs for a particular user of Shareaza can differ for various reasons, including the following: (1) the user is uninstalling and reinstalling Shareaza; (2) the user is using Shareaza to generate a new GUID through the settings function of Shareaza; or (3) the user is accessing Gnutella on multiple devices, each of which would have a different GUID.  A difference in GUID between two online sessions of Shareaza, then, does not mean that the Shareaza user during these two sessions is different.

### VIII.   **STATEMENT OF PROBABLE CAUSE**

**A.   Online Investigation**

31.  Between October 19, 2021, and October 20, 2021, I was conducting an on-line Internet investigation to identify suspects possessing and sharing child pornography.  I used a Law

Enforcement Peer to Peer ("P2P") client software program.  This P2P client software program allows investigators to download from a single source (rather than multiple sources).  This enables the investigator to be sure that the entire file came from a single target computer.  During my investigation I identified a computer using the Internet Protocol Address 172.116.240.63 ("SUSPECT IP ADDRESS") sharing files of possible CSAM.

32.  During the online investigation I was able obtain the following user information:

a.  Protocol: Gnutella2

b.  Client Software: Shareaza 2.7.10.2

c.  IP Address: 172.116.240.63

d.  GUID: B972135F430CCF40ADB586450474C064

33.  On or about October 19, 2021, I downloaded a video file from a computer using the SUSPECT IP ADDRESS, approximately ten minutes and seven seconds in length, entitled "! New ! (Pthc) Mikayla Heckmoth 8Yr - Fucking With Daddy Every Day - May Digitally Restored Pedo.mp4."  I have reviewed this video and it appears to be a compilation of images that depict a girl that appears to be approximately nine to eleven years old in different locations and in multiple stages of undress, including fully nude with close ups of her vagina and anus. Numerous photos include the child performing oral copulation on an adult male's penis.

17

34.   On or about October 19, 2021, I downloaded a video file from a computer using the SUSPECT IP ADDRESS, approximately two minutes and seventeen seconds in length, entitled "APRIL (~pthc center~)(opva)(2013) Nice 9yo bitch fucked Fuck Me (joined).AVI."  I have reviewed this video and it depicts a girl, approximately eight to ten years old, who is positioned on her back with her legs spread exposing her vagina.  The words "FUCK ME" with an arrow pointed to her vagina is written on her stomach.  An adult male holding his erect penis makes numerous attempts to penetrate her vagina while rubbing his penis inside her. The video finishes with an adult male ejaculating on the child's face and mouth.

35.   On or about October 19, 2021, I downloaded a video file from a computer using the SUSPECT IP ADDRESS, approximately two minutes in length, entitled "(PHANT) -- mom suck 2min son GGG PTHC 2020.mp4."  I have reviewed this video and it depicts a boy approximately three to five years old lying naked on his back as an adult female performs oral copulation on him.

**B.   Identification of Subscriber of SUSPECT IP ADDRESS and SUBJECT PREMISES**

36.   According to information provided by Charter Communications (the "ISP"), pursuant to a DHS Summons issued on October 25, 2021 – covering the time period during which the SUSPECT IP ADDRESS was used to distribute the child pornography via the Gnutella network - the SUSPECT IP ADDRESS was assigned

to subscriber Guadalupe Hernandez-Lomeli at the SUBJECT
PREMISES.

37.  On or about November 17, 2021, and November 23, 2021,
I reviewed California Department of Motor Vehicles ("DMV")
records for multiple vehicle license numbers and individuals
associated with the SUBJECT PREMISES.

38.  On or about December 10, 2021, at approximately 10:40
a.m., I conducted surveillance at the SUBJECT PREMISES.  At
approximately 10:50 a.m., I witnessed an adult male believed to
be Manuel Alejandro Marti leaving the SUBJECT PREMISES and
driving away in a white Toyota SUV registered to Marti at a
different address.  At approximately 11:07 a.m., I witnessed a
silver Ford truck registered to Guadalupe Hernandez-Lomeli pull
into the driveway and two females exit.  The females preceded to
unload items from the bed of the truck into the SUBJECT
PREMISES.  On January 7, 2022, I again witnessed the above
Toyota SUV parked in the driveway of the SUBJECT PREMISES.

IX.    **TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL
INTEREST IN CHILDREN**

39.  Based on the information above, there is probable
cause to believe that someone at the SUBJECT PREMISES possesses
child pornography, and also makes it available for distribution.
Based on my training and experience, and the training and
experience of other law enforcement officers with whom I have
had discussions, I have learned that individuals who view and
possess multiple images of child pornography are often

individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.    Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children or from fantasies they may have from viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

b.    Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Individuals who have a sexual interest in children or images of children sometimes possess and maintain "hard copies" of child pornographic material – that is, pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc.

20

When they do, they generally possess these materials in the privacy and security of their home or some other secure location.  When individuals who have a sexual interest in children or images of children collect pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes, they often retain these materials for many years.

d.   Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

e.   Individuals who have a sexual interest in children or images of children may correspond with and/or meet others to share information and materials; often retain correspondence from other child pornography distributors/ collectors; conceal such correspondence as they do with their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact with and who share the same interests in child pornography.

f.   Individuals who have a sexual interest in children or images of children prefer not to be without their

21

child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.[3]

**X.      TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]**

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

42.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   In my training and experience, the person who is
in possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.  However, in my training and experience, that person
may not be the only user of the device whose physical
characteristics are among those that will unlock the device via
biometric features, and it is also possible that the person in
whose possession the device is found is not actually a user of
that device at all.  Furthermore, in my training and experience,

25

I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

43. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

XI.  **CONCLUSION**

44. For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(2) (distribution of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), as described in Attachment B to this affidavit, will be found in a search of the SUBJECT PREMISES,

which is further described above and in Attachment A of this
affidavit.


_____
KEVIN LEDUC
Special Agent
Homeland Security
Investigations


Attested to by the applicant in
accordance with the requirements
of Fed. R.  Crim. P. 4.1 by
telephone on this ___ day of
January 2022.


_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is the property located at 2225
S. Maple St, Santa Ana, California 92707.  The SUBJECT
PREMISES is a single-story home with a detached garage,
with two white single garage doors both facing south.  The
SUBJECT PREMISES has cream stucco exterior and a blue
shingle roof.  The front door of the SUBJECT PREMISES is
brown with a black security door facing South.  The numbers
"2225" are affixed in black numbers on white tile above the
entry way to the front door of the house facing the street.

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography), namely:

a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or documents that refer to a transaction of any kind involving child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or involved in a

1

transaction of any kind involving child pornography, as defined in 18 U.S.C. § 2256(8).

 d. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

 e. Any and all records, documents, programs, applications, materials, or items that are sexually arousing to individuals who are interested in minors, but that are not in and of themselves obscene or that do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques relating to child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

 f. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to peer-to-peer file-sharing software.

 g. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

 h. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages,

regarding ownership and/or possession of 2225 S Maple St, Santa Ana, California  92707 (the "SUBJECT PREMISES").

   i. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

   j. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v. evidence of the times the device was used;

          vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.    records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony

PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II. **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

      c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    5.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.